**WHOLE WOMAN'S HEALTH,** Austin Woman's Health Center, Killeen Woman's Health Center, Nova Health Systems d/b/a Reproductive Services, and Sherwood C. Lynn, Jr., M.D., Pamela J. Richter, D.O., and Lendol L. Davis, M.D., each on behalf of themselves and their Patients, Plaintiffs,

v.

**David LAKEY, M.D.,** Commissioner of the Texas Department of State Health Services, in his official capacity, and Mari Robinson, Executive Director of the Texas Medical Board, in her official capacity, Defendants.

Cause No. 1:14–CV–284–LY.

United States District Court,
W.D. Texas,
Austin Division.

Signed Aug. 29, 2014.

Betre M. Gizaw, Marissa P. Harris, Morrison & Foerster LLP, Washington, DC, Colin M. O'Brien, Morrison & Foerster, LLP, Denver, CO, J. Alexander Lawrence, Kiersten A. Fletcher, Morrison & Foerster, LLP, New York, NY, Jan Soifer, Patrick J. O'Connell, O'Connell & Soifer, LLP, John H. Bucy, II, Law Office of John H. Bucy, II, Austin, TX, David P. Brown, Esha Bhandari, Janet Crepps, Stephanie Toti, Natasha Lycia Ora Bannan, New York, NY, for Plaintiffs.

Andrew S. Oldham, Andrew Bowman Stephens, Beth Klusmann, Esteban San Miguel Soto, James Davis Blacklock, Jona-

than F. Mitchell, Enrique M. Varela, Office of the Attorney General, Michael P. Murphy, Texas Attorney General, Austin, TX, for Defendants.

### FINAL JUDGMENT

LEE YEAKEL, District Judge.

Before the court is the above-styled and numbered cause. On May 12, 2014, upon joint motion of the parties, the court dismissed from this action Defendants Travis County Attorney David Escamilla, El Paso District Attorney Jaime Esparza, Hidalgo County Criminal District Attorney Rene Guerra, Bell County Attorney James E. Nichols, Bexar County Criminal District Attorney Susan Reed, Tarrant County Criminal District Attorney Joe Shannon, Jr., and Dallas County Criminal District Attorney Craig Watkins, each in their official capacities, and their employees, agents, and successors. On August 1, 2014, the court dismissed Plaintiffs Whole Woman's Health, Austin Woman's Health Center, Killeen Woman's Health Center, Nova Health Systems d/b/a Reproductive Services, and Sherwood C. Lynn, Jr., M.D., Pamela J. Richter, D.O., and Lendol L. Davis, M.D., on behalf of themselves and their patients's claims alleging federal equal-protection violations, improper delegation of lawmaking authority, and arbitrary and unreasonable state action against Defendants David Lakey, M.D., Commissioner of the Texas Department of State Health Services, in his official capacity, and Mari Robinson, Executive Director of the Texas Medical Board, in her official capacity (together the "State"). On this date by Memorandum Opinion Incorporating Findings of Fact and Conclusions of Law, the court found and concluded that the ambulatory-surgical-center requirement of the Act of July 12, 2013, 83rd Leg., 2nd C.S., ch. 1, 2013 Tex. Gen. Laws 4795; ("House Bill 2") (codified at Tex.

Health & Safety Code Ann. §§ 171.0031, 245.010(a) (West Supp.2014)) is unconstitutional, that the admitting-privileges and ambulatory-surgical-center requirements of House Bill 2 as applied to Plaintiffs Whole Woman's Health clinic in McAllen, Texas, and Nova Health Systems's clinic in El Paso, Texas, are unconstitutional, that the ambulatory-surgical-center requirement of House Bill 2, as applied to medication abortions, is unconstitutional, and that the provisions considered together create an impermissible obstacle as applied to all women seeking a previability abortion. As nothing remains for the court to resolve, the court renders the following final judgment pursuant to Federal Rule of Civil Procedure 58.

THE COURT DECLARES that the portion of the Texas Health and Safety Code, Section 245.010(a), "On and after September 1, 2014, the minimum standards for an abortion facility must be equivalent to the minimum standards adopted under Section 243.010 for ambulatory surgical centers" is unconstitutional:

1. As to all abortion facilities in the State, with the exception of

(a) abortion facilities currently licensed and meeting the minimum standards adopted under the Texas Health and Safety Code, Section 243.010 for ambulatory surgical centers, and

(b) abortion facilities commencing operation after September 1, 2014, and which were not previously licensed abortion facilities under the Texas Health and Safety Code, Section 245.

2. As applied to the provision of medical abortion, as defined in Texas Health and Safety Code, Section 171.061.

THE COURT FURTHER DECLARES that the portion of Texas Health and Safety Code, Section 171.0031(a)(1) is unconsti-

tutional as applied to Plaintiffs Whole Woman's Health and Sherwood Lynn with respect to the operation of an abortion facility in McAllen, Texas, and Plaintiffs Nova Health Systems and Pamela Richter with respect to the operation of an abortion facility in El Paso, Texas.

**THE COURT FURTHER DECLARES** that the two portions of Texas Health and Safety Code, Sections 245.010(a) and 171.0031(a)(1), create an impermissible obstacle as applied to all women seeking a previability abortion.

**IT IS ORDERED** that the State, its agents, employees, and any other persons or entities acting on its behalf are enjoined from enforcing the above-listed portions of sections of the Texas Health and Safety Code to the extent stated herein, including enforcing any criminal and administrative penalties against any person accused of violating any provision of the Texas Health and Safety Code declared unconstitutional by this final judgment.

Any claim for attorney's fees incurred in this action will be determined post judgment and pursuant to Rule CV–7(j), of the Local Rules of the United States District Court for the Western District of Texas.

**IT IS FURTHER ORDERED** that Plaintiffs recover their costs of court.

**IT IS FURTHER ORDERED,** except as expressly provided herein, all other relief requested by any party is **DENIED.**

### MEMORANDUM OPINION INCORPORATING FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs Whole Woman's Health, Austin Woman's Health Center, Killeen Woman's Health Center, Nova Health Systems d/b/a Reproductive Services, Dr. Sherwood Lynn, Jr., Dr. Pamela Richter, and Dr. Lendol Davis (collectively "Plaintiffs"), all providers of abortion services, bring this action on behalf of themselves and their patients against David Lakey, M.D., Commissioner of the Texas Department of State Health Services and Mari Robinson, Executive Director of the Texas Medical Board, each in their official capacities (together the "State"). Plaintiffs seek declaratory and injunctive relief nullifying two requirements of Texas law recently imposed by the Texas Legislature and the rules that implement such law. Act of July 12, 2013, 83rd Leg., 2nd C.S., ch. 1, 2013 Tex. Gen. Laws 4795; ("House Bill 2" or the "act") (codified at Tex. Health & Safety Code Ann. §§ 171.0031, 245.010(a) (West Supp.2014)); *see also* 38 Tex. Reg. 9577–93 (adoption of proposed rules), 25 Tex. Admin. Code §§ 139.40, .53(c), .56(a).

The act's "admitting-privileges requirement" provides, in part, that "[a] physician performing or inducing an abortion must, on the date the abortion is performed or induced, have active admitting privileges at a hospital that is located not further than 30 miles from the location at which the abortion is performed or induced." Tex. Health & Safety Code Ann. § 171.0031(a)(1); 25 Tex. Admin. Code §§ 139.53(c), .56(a). The "ambulatory-surgical-center requirement" provides, in relevant part, that by September 1, 2014, "the minimum standards for an abortion facility must be equivalent to the minimum standards adopted under [Texas Health & Safety Code] Section 243.010 for ambulatory surgical centers." Tex. Health & Safety Code Ann. § 245.010(a); 25 Tex. Admin. Code § 139.40.

The admitting-privileges requirement was the subject of a pre-enforcement facial challenge brought by several abortion providers, including some of the plaintiffs in this case. This court permanently enjoined enforcement of the requirement on October 28, 2013. *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Ab-*

*bott,* 951 F.Supp.2d 891 (W.D.Tex.2013). The United States Court of Appeals for the Fifth Circuit stayed the injunction, *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott (Abbott I )*, 734 F.3d 406 (5th Cir.2013), and ultimately reversed this court's judgment, concluding that the admitting-privileges requirement is constitutional on its face. *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott (Abbott II )*, 748 F.3d 583 (5th Cir.2014).

Now, Whole Woman's Health and Lynn challenge the admitting-privileges requirement as applied to an abortion facility operated by Whole Woman's Health in McAllen, Texas (the "McAllen clinic"). Nova Health Systems and Richter challenge the admitting-privileges requirement as applied to an abortion facility operated by Nova Health Systems in El Paso, Texas (the "El Paso clinic"). All Plaintiffs challenge the ambulatory-surgical-center requirement on its face and as applied to the provision of medication abortion; Whole Woman's Health and Lynn challenge the ambulatory-surgical-center requirement as applied to the McAllen Clinic; and Nova Health Systems and Richter challenge the ambulatory-surgical-center requirement as applied to the El Paso Clinic. This court has federal-question jurisdiction. *See* 28 U.S.C. §§ 1331, 1343(a). Plaintiffs occupy substantially the same position as the plaintiffs in the previous action before this court and thus have standing to assert these claims. *Abbott II,* 748 F.3d at 589.

Before trial, the court granted in part the State's motion to dismiss and dismissed several of Plaintiffs' claims with prejudice. *Whole Woman's Health v. Lakey,* No. 1:14–CV–284–LY (W.D.Tex. Aug. 1, 2014) (order on motion to dismiss). Specifically, the court dismissed Plaintiffs' equal-protection, improper-delegation-of-lawmaking-authority, and arbitrary-and-unreasonable-state-action claims. *Id.* As a result, the following claims remain: (1) the admitting-privileges requirement, as applied to the McAllen and El Paso clinics, violates the Due Process Clause of the Fourteenth Amendment with regard to women in the Rio Grande Valley and West Texas and (2) the ambulatory-surgical-center requirement, facially in regard to all Texas women and, as applied to the McAllen and El Paso clinics specifically, with regard to women in the Rio Grande Valley and West Texas, violates the Due Process Clause of the Fourteenth Amendment. The court will also consider whether the act as a whole operates to place before the women of Texas a substantial obstacle to an abortion of a nonviable fetus.

Both parties waived a jury, and the court conducted a bench trial on these issues that commenced on August 4, 2014. All parties were represented by counsel and appeared either individually or by counsel.

Having carefully considered the parties' briefs, stipulations, exhibits, trial testimony, arguments of counsel, and the applicable law, the court concludes: (1) the act's ambulatory-surgical-center requirement places an unconstitutional undue burden on women throughout Texas and must be enjoined; (2) the act's ambulatory-surgical-center and admitting-privileges requirements, as applied to the McAllen and El Paso clinics, place an unconstitutional undue burden on women in the Rio Grande Valley, El Paso, and West Texas and must be enjoined; and (3) the act's ambulatory-surgical-center and admitting-privileges requirements operate together to place an unconstitutional undue burden on women throughout Texas and must be enjoined. In so deciding, the court makes the following findings of fact and conclusions of law.[1]

## I. LAW GOVERNING ABORTION REGULATIONS

██ "The woman's right to terminate her pregnancy before viability is the most central principle of *Roe v. Wade* [410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)]. It is a rule of law and a component of liberty we cannot renounce." *Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833, 846, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). The Supreme Court has written of this interest held by individual women:

> [T]he liberty of the woman is at stake in a sense unique to the human condition and so unique to the law. The mother who carries a child to full term is subject to anxieties, to physical constraints, to pain that only she must bear. That these sacrifices have from the beginning of the human race been endured by woman with a pride that ennobles her in the eyes of others and gives to the infant a bond of love cannot alone be grounds for the State to insist she make the sacrifice. Her suffering is too intimate and personal for the State to insist, without more, upon its own vision of the woman's role, however dominant that vision has been in the course of our history and our culture. The destiny of the woman must be shaped to a large extent on her own conception of her spiritual imperatives and her place in society.

*Casey,* 505 U.S. at 852, 112 S.Ct. 2791.

██ Still, after over 40 years, this basic right—among the most contested and controversial of all rights protected by our Constitution—is layered with myriad limitations and qualifications. *See Jackson Women's Health Org. v. Currier,* 760 F.3d 448, 453–54 (5th Cir.2014). A state may regulate a woman's right to an abortion consistent with that state's interest in protecting the health of the mother and the potential life of the unborn. *Casey,* 505 U.S. at 846, 112 S.Ct. 2791. However, a law is unconstitutional if it imposes an undue burden on a woman's right to an abortion. "A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus.... [A] statute which, while furthering the interest in potential life or some other valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends." *Id.* at 877, 112 S.Ct. 2791. The undue-burden standard is "the appropriate means of reconciling the State's interest with the woman's constitutionally protected liberty." *Casey,* 505 U.S. at 876, 112 S.Ct. 2791. In reaching a

---

1. In making these findings and conclusions, the court has considered the record as a whole. The court has observed the demeanor of the witnesses and has carefully weighed that demeanor and the witnesses' credibility in determining the facts of this case and drawing conclusions from those facts. Further, the court has thoroughly considered the testimony of both sides' expert witnesses and has given appropriate weight to their testimony in selecting which conclusions to credit and upon which not to rely. *Garcia v. Kerry,* 557 Fed.Appx. 304, 309 (5th Cir.2014) ("It is settled law that the weight to be accorded expert opinion evidence is solely within the discretion of the judge sitting without a jury. In a bench trial, the district court is not obligated to accept or credit expert witness testimony.") (citing *Pittman v. Gilmore,* 556 F.2d 1259, 1261 (5th Cir.1977); *Albany Ins. Co. v. Anh Thi Kieu,* 927 F.2d 882, 894 (5th Cir.1991)). All findings of fact contained herein that are more appropriately considered conclusions of law are to be so deemed. Likewise, any conclusion of law more appropriately considered a finding of fact shall be so deemed.

determination of whether a law imposes an undue burden, this court looks to the entire record and factual context in which the law operates. *See id.* at 887–95, 112 S.Ct. 2791 (looking to factual context in striking down Pennsylvania's spousal-notification provision); *Currier,* 760 F.3d at 458.

The Supreme Court added rational basis review to the judicial evaluation of abortion regulations in *Gonzales v. Carhart,* 550 U.S. 124, 158, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007) ("Where it has a rational basis to act, *and* it does not impose an undue burden, the State may use its regulatory power") (emphasis added); *see also Currier,* 760 F.3d at 453–54; *Abbott II,* 748 F.3d at 590. Bound by the Fifth Circuit's holding in *Abbott II,* this court held that both the ambulatory-surgical-center requirement and the admitting-privilege requirement, as applied to the El Paso and Rio Grande Valley clinics, surmount the low bar of rational-basis review. *Whole Woman's Health v. Lakey,* No. 1:14–CV–284–LY (W.D.Tex. Aug. 1, 2014) (order on motion to dismiss); *Abbott II,* 748 F.3d at 595–96; *Currier,* 760 F.3d at 453–54. Despite the finding of a rational-basis, however, this court must determine whether the act places an undue burden before a woman seeking a legal abortion. *Casey,* 505 U.S. at 876–78, 112 S.Ct. 2791; *see Gonzales,* 550 U.S. at 156, 127 S.Ct. 1610; *see also Abbott II,* 748 F.3d at 597 ("Even though the State articulated rational bases for this law, and even though its purpose was not impugned, [the plaintiff] could succeed if the effect of the law substantially burdened women's access to abortions in Texas.").

## II. DISCUSSION

The parties presented competing evidence at trial, largely through expert-witness declarations and cross examination.[2] The experts' testimony substantially contradicted each other and, predictably, reached opposing conclusions.[3] Such is the nature of expert testimony.

Of more value to the court are the parties' stipulated facts. After September 1, 2014, only seven facilities and a potential eighth will exist in Texas that will not be prevented by the ambulatory-surgical-center requirement from performing abortions. These remaining abortion facilities will be located along the I–35 and I–45 corridors; there will be one facility in Austin, two in Dallas, one in Fort Worth, two in Houston, and either one or two in San Antonio. No other abortion facility licensed by the State of Texas currently satisfies the ambulatory-surgical-center requirement of the act; therefore, each of the currently licensed facilities that are not ambulatory surgical centers will be prohibited from performing abortions effective September 1, 2014, without complying with the new requirements. Additionally, there are 433 licensed ambulatory surgical centers in Texas, 336 of which are "considered to be an existing licensed [ambulatory surgical center]" and are apparently either

**2.** To the extent that the State objects to Plaintiffs' designation of the State's experts' deposition testimony, that objection is overruled.

**3.** The credibility and weight the court affords the expert testimony of the State's witnesses Drs. Thompson, Anderson, Kitz, and Uhlenberg is informed by ample evidence that, at a very minimum, Vincent Rue, Ph.D., a non-physician consultant for the State, had considerable editorial and discretionary control over the contents of the experts' reports and declarations. The court finds that, although the experts each testified that they personally held the opinions presented to the court, the level of input exerted by Rue undermines the appearance of objectivity and reliability of the experts' opinions. Further, the court is dismayed by the considerable efforts the State took to obscure Rue's level of involvement with the experts' contributions.

"grandfathered" or enjoying the benefit of a waiver of some or all of the requirements of ambulatory-surgical-center certification due to these centers' earlier licensure dates or compliance with other regulatory schemes. *See* 25 Tex. Admin. Code § 135.51(a). Finally, Reproductive Services of Harlingen has not provided abortion services since the admitting-privileges requirement of the act took effect.

The evidence introduced by the parties at trial further reveals the breadth and effect of House Bill 2. Texas contains nearly 280,000 square miles, is ten percent larger than France, and is home to the second highest number of reproductive-age women in the United States. Such women account for approximately 5.4 million of over 25 million Texas residents. In recent years, the number of abortions reported in Texas has stayed fairly consistent at approximately 15–16% of the reported pregnancy rate, for a total number of approximately 60,000–72,000 legal abortions performed annually.

Before the enactment of House Bill 2, there were more than 40 licensed abortion facilities providing abortion services throughout Texas. That number dropped by almost half leading up to and in the wake of enforcement of the admitting-privileges requirement that went into effect in late-October 2013. Clinics closed throughout the state, leaving no abortion provider in McAllen, Harlingen, Lubbock, Midland, San Angelo, Beaumont, Stafford, Killeen, or Waco. If allowed to go into effect, the act's ambulatory-surgical-center requirement will further reduce the number of licensed abortion-providing facilities to, at most, eight. On September 1, 2014, abortion providers will remain only in Houston, Austin, San Antonio, and the Dallas/Fort Worth metropolitan region. Abortion clinics where doctors were previously able to comply with House Bill 2's admitting-privilege requirement will close in Corpus Christi, San Antonio, Austin, El Paso, Houston, and Dallas.

Between November 1, 2012 and May 1, 2014, the decrease in geographic distribution of abortion facilities has required a woman seeking an abortion to travel increased distance. The number of women of reproductive age living in a county more than 50 miles from a Texas abortion clinic has increased from approximately 800,000 to over 1.6 million; women living in a county more than 100 miles from a provider increased from approximately 400,000 to 1,000,000; women living in a county more than 150 miles from a provider increased from approximately 86,000 to 400,000; and the number of women living in a county more than 200 miles from a provider from approximately 10,000 to 290,000. If not enjoined, the ambulatory-surgical-center requirement will further increase those numbers: after September 1, 2014, approximately 2 million women will live further than 50 miles, 1.3 million further than 100 miles, 900,000 further than 150 miles, and 750,000 further than 200 miles. Even presuming a wide margin of error in these calculations,[4] the inference is straightforward: the cumulative effect of clinic closures and the lessened geographic distribution of abortion services in the wake of the act's two major requirements is that a significant number of the reproductive-age female population of Texas will need to travel considerably further in order to ex-

---

4. The court finds the estimates provided by the State's expert, Todd Giberson, to be a less reliable assessment of the true impact on the reproductive-age women of Texas because, in part, his calculations were based on distances measured from abortion providers in New Mexico, El Paso, McAllen, and Lubbock. The court finds fewer overall indicia of reliability in Giberson's conclusions than those of Plaintiffs' expert Dr. Grossman.

ercise its right to a legal previability abortion.

The ambulatory-surgical-center requirement imposes extensive new standards on abortion facilities by requiring them to meet enhanced standards for new construction. *See* 25 Tex. Admin. Code § 139.40. The requirement applies equally to abortion clinics that only provide medication abortion, even though no surgery or physical intrusion into a woman's body occurs during this procedure. The standards prescribe electrical, heating, ventilation, air conditioning, plumbing, and other physical plant requirements as well as staffing mandates, space utilization, minimum square footage, and parking design. Notably, grandfathering of existing facilities and the granting of waivers from specific requirements is prohibited for abortion providers, although other types of ambulatory-surgical facilities are frequently granted waivers or are grandfathered due to construction dates that predate the newer construction requirements.

According to both sides' experts, the cost of coming into compliance for existing clinics is significant. If a clinic is able to make renovations to comply, those costs will undisputedly approach 1 million dollars and will most likely exceed 1.5 million dollars. Some existing clinics cannot comply due to physical size limitations of their sites. The cost of acquiring land and constructing a new compliant clinic will likely exceed three million dollars. Adapting existing clinics statewide will presumably present similarly high costs and that, although some variance is to be expected, the cost of constructing a new, compliant facility elsewhere in the state is likewise prohibitive. Combined with evidence of operational costs and profit margins associated with operating an abortion facility, the court concludes that few, if any, new compliant abortion facilities will open to meet the demand resulting from existing clinics' closure. Existing clinics, unable to meet the financial burdens imposed by the new regulatory regime, will close as a result.

The clinic closings attributable to the act's two requirements will undeniably reduce meaningful access to abortion care for women throughout Texas. Even assuming every woman in Texas who wants to obtain an abortion after September 1, 2014, could travel to one of the four metropolitan areas where abortions will still be available, the cumulative results of House Bill 2 are that, at most, eight providers would have to handle the abortion demand of the entire state. Based on historical data pertaining to Texas's average number of abortions, and assuming perfectly equal distribution among the remaining seven or eight providers, this would result in each facility serving between 7,500 and 10,000 patients per year. Accounting for the seasonal variations in pregnancy rates and a slightly unequal distribution of patients at each clinic, it is foreseeable that over 1,200 women per month could be vying for counseling, appointments, and follow-up visits at some of these facilities. That the State suggests that these seven or eight providers could meet the demand of the entire state stretches credulity.

Even if the remaining clinics could meet the demand, the court concludes that the practical impact on Texas women due to the clinics' closure statewide would operate for a significant number of women in Texas just as drastically as a complete ban on abortion. The State argues that the Fifth Circuit has established a *de facto* "safe harbor" of 150 miles and that no abortion regulation that increases travel distance alone could act as an undue burden on the right to previability abortion. *Abbott II*, 748 F.3d at 598; *Abbott I*, 734 F.3d at 415; *Currier*, 760 F.3d at 462–63. But here,

the record conclusively establishes that increased travel distances *combine* with practical concerns unique to every woman. These practical concerns include lack of availability of child care, unreliability of transportation, unavailability of appointments at abortion facilities, unavailability of time off from work, immigration status and inability to pass border checkpoints, poverty level, the time and expense involved in traveling long distances, and other, inarticulable psychological obstacles. These factors combine with increased travel distances to establish a *de facto* barrier to obtaining an abortion for a large number of Texas women of reproductive age who *might* choose to seek a legal abortion. The court further concludes that women in the border communities of the Rio Grande Valley and El Paso will be affected most heavily due to longer travel distances (in some cases exceeding 500 miles), higher-than-average poverty levels, and other issues uniquely associated with minority and immigrant populations.

Women living in other areas of Texas will be similarly affected. It is impossible to conclusively measure the individualized factors that act on each woman's decision to seek or forgo an abortion due to the procedure's relative unavailability. Such decisions necessarily "involve personal decisions concerning not only the meaning of procreation but also human responsibility and respect for it." *Casey*, 505 U.S. at 853, 112 S.Ct. 2791. It is also impossible to divine exactly how many women in Texas may be affected by any individual factor or combination of factors to the point of not being able to exercise their right to obtain an abortion.

The act operates in conjunction with Texas's other regulations on abortion, some of which provide significant burdens in their own right. For example, a woman living fewer than 100 miles from a licensed facility is required to wait 24 hours from her initial consultation and make another trip to the facility to complete the procedure. Tex. Health & Safety Code Ann. § 171.012 (West 2014). Even if a woman lives further than 100 miles, she must wait a minimum of two hours from her initial consultation before completing the procedure, adding time to her total time away from work or family responsibilities and complicating the scheduling of the abortion procedure. *Id.* The proverbial "last straw" that encumbers a woman's choice to have an abortion is unknowable to anyone other than that individual woman. It is equally implausible for a plaintiff in a case such as this to conclusively establish factors that act uniformly upon all women across a state as large and diverse as Texas.

A financially disadvantaged woman, now living 50 miles from the nearest abortion clinic may be just as heavily burdened by practical concerns which combine with travel distance, as a woman now living 200 miles away. It is overly simplistic and reductionist to conclude that absolute distances or theoretical travel times measured under ideal circumstances act identically on a population as diverse as Texas's. They simply do not. It is equally unrealistic to conclude that absolute travel distance is the only meaningful obstacle raised by House Bill 2's elimination of more than 30 previously operating abortion facilities. The act's two requirements erect a particularly high barrier for poor, rural, or disadvantaged women throughout Texas, regardless of the absolute distance they may have to travel to obtain an abortion. A woman with means, the freedom and ability to travel, and the desire to obtain an abortion, will always be able to obtain one, in Texas or elsewhere. However, *Roe's* essential holding guarantees to all women, not just those of means, the right to a previability abortion.

The court concludes that the act's ambulatory-surgical-center requirement, combined with the already in-effect admitting-privileges requirement, creates a brutally effective system of abortion regulation that reduces access to abortion clinics thereby creating a statewide burden for substantial numbers of Texas women. The obstacles erected for these women are more significant than the "incidental effect of making it more difficult or more expensive to procure an abortion." *Casey*, 505 U.S. at 874, 112 S.Ct. 2791. The court concludes that the overall lack of practical access to abortion services resulting from clinic closures throughout Texas as a result of House Bill 2 is compelling evidence of a substantial obstacle erected by the act.

The court also concludes that the severity of the burden imposed by both requirements is not balanced by the weight of the interests underlying them. The primary interest proffered for the act's requirements relate to concerns over the health and safety of women seeking abortions in Texas. To the extent that the State argues that the act's requirements are motivated by a legitimate interest in fetal life, the court finds those arguments misplaced. In contrast to the regulations at issue in *Casey*, the act's challenged requirements are solely targeted at regulating the performance of abortions, not the decision to seek an abortion. Here, the only possible gain realized in the interest of fetal life, once a woman has made the decision to have a previability abortion, comes from the ancillary effects of the woman's being unable to obtain an abortion due to the obstacles imposed by the act. The act creates obstacles to previability abortion. It does not counsel against the decision to seek an abortion.

The great weight of the evidence demonstrates that, before the act's passage, abortion in Texas was extremely safe with particularly low rates of serious complications and virtually no deaths occurring on account of the procedure. Giving appropriate weight to the experts' conflicting testimony, the court concludes that concerns over incomplete complication reporting and underestimated complication rates are largely unfounded and are without a reliable basis. Abortion, as regulated by the State before the enactment of House Bill 2, has been shown to be much safer, in terms of minor and serious complications, than many common medical procedures not subject to such intense regulation and scrutiny. Additionally, risks are not appreciably lowered for patients who undergo abortions at ambulatory surgical centers as compared to nonsurgical-center facilities. Plaintiffs have demonstrated that women will not obtain better care or experience more frequent positive outcomes at an ambulatory surgical center as compared to a previously licensed facility.

Many of the building standards mandated by the act and its implementing rules have such a tangential relationship to patient safety in the context of abortion as to be nearly arbitrary. Furthermore, the court concludes that it is unlikely that the stated goal of the requirement—improving women's health—will actually come to pass. Higher health risks associated with increased delays in seeking early abortion care, risks associated with longer distance automotive travel on traffic-laden highways, and the act's possible connection to observed increases in self-induced abortions almost certainly cancel out any potential health benefit associated with the requirement. The court finds no particularized health risks arising from abortions performed in nonambulatory-surgical-center clinics which countenance the imposition of the ambulatory-surgical-center requirement on the provision of all abortions. The imposition of such requirements is

even weaker in the context of medication abortions, where no surgery is involved.

Similarly, the court finds that, as applied to Plaintiff abortion providers in the Rio Grande Valley and El Paso, the interests underlying the admitting-privileges requirement fall short in many of the same ways when compared to the burden the requirement imposes on women in those areas. Evidence related to patient abandonment and potential improved continuity of care in emergency situations is weak in the face of the opposing evidence that such complications are exceedingly rare in Texas, nationwide, and specifically with respect to the Plaintiff abortion providers. Additional objectives proffered for the requirement, such as physician screening and credentialing are not credible due, in part, to evidence that doctors in Texas have been denied privileges for reasons not related to clinical competency. At most, the court finds the credentialing rationale weak and speculative. The court concludes that the heavy burden imposed on the women of West Texas, El Paso, and the Rio Grande Valley by the admitting-privileges requirement is not appropriately balanced by a credible medical or health rationale.

After thorough consideration of the severity of the burdens presented by the act's two requirements, the court concludes that the requirements, independently and when viewed as they operate together, have the ultimate effect of erecting a substantial obstacle for women in Texas who seek to obtain a previability abortion. In other words, the obstacles imposed by the act's ambulatory-surgical-center requirement, with regard to women throughout Texas, and the act's admitting-privileges requirement combined with the ambulatory-surgical-center requirement, as applied to the Rio Grande Valley and El Paso clinics, are constitutionally impermissible.

An abortion regulation is also violative of a woman's right to an abortion if it was adopted with the purpose of erecting a substantial obstacle to a woman's ability to choose a previability abortion. *Gonzales,* 550 U.S. at 156, 127 S.Ct. 1610. Because the act's two requirements have the effect of creating an undue burden, an additional finding that the act was passed with the purpose of erecting a substantial obstacle is not required in order to declare the act unconstitutional. However, the court concludes, after examining the act and the context in which it operates, that the ambulatory-surgical-center requirement was intended to close existing licensed abortion clinics. The requirement's implementing rules specifically deny grandfathering or the granting of waivers to previously licensed abortion providers. This is in contrast to the "frequent" granting of some sort of variance from the standards which occur in the licensing of nearly three-quarters of all licensed ambulatory surgical centers in Texas. Such disparate and arbitrary treatment, at a minimum, suggests that it was the intent of the State to reduce the number of providers licensed to perform abortions, thus creating a substantial obstacle for a woman seeking to access an abortion. This is particularly apparent in light of the dearth of credible evidence supporting the proposition that abortions performed in ambulatory surgical centers have better patient health outcomes compared to clinics licensed under the previous regime.

Finally, the court finds the suggestion of an impermissible purpose in one of the State's arguments relating to the El Paso clinic. In arguing that the act does not impose an undue burden, the State posits that El Paso and West Texas residents

may easily seek previability abortions in neighboring New Mexico, a state without a requirement that abortions be performed in an ambulatory surgical center. *Currier*, 760 F.3d at 458. If the State's true purpose in enacting the ambulatory-surgical-center requirement is to protect the health and safety of Texas women who seek abortions, it is disingenuous and incompatible with that goal to argue that Texas women can seek abortion care in a state with lesser regulations. If, however, the State's underlying purpose in enacting the requirement was to reduce or eliminate abortion in parts or all of Texas, the State's position is perfectly congruent with such a goal.

House Bill 2's ambulatory-surgical-center requirement burdens Texas women in a way incompatible with the principles of personal freedom and privacy protected by the United States Constitution for the 40 years since *Roe v. Wade*. Through strict regulations that will result in an unprecedented percentage of licensed abortion facilities closing across the state, the requirement will severely limit access to abortion care for untold numbers of women throughout the state. When viewed in the context of the other state-imposed obstacles a woman faces when seeking an abortion in Texas-including a sonogram requirement, a waiting period, and the reduced number of abortion-performing physicians resulting from the admitting-privilege requirement—the court is firmly convinced that the State has placed unreasonable obstacles in the path of a woman's ability to obtain a previability abortion. These substantial obstacles have reached a tipping point that threatens to "chip away at the private choice shielded by *Roe*," *Stenberg v. Carhart*, 530 U.S. 914, 952, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000) (Ginsburg, J., concurring), and effectively reduce or eliminate meaningful access to safe abortion care for a significant, but ultimately unknowable, number of women throughout Texas.

Likewise, for women living in the Rio Grande Valley, El Paso, and West Texas, the admitting-privileges and ambulatory-surgical-center requirements, acting in conjunction as applied to the McAllen clinic and the El Paso clinic, impose an undue burden on the right to a previability abortion. The evidence is even stronger that the requirements will affect a substantial number of women living in these communities, and the act's two requirements are unconstitutional as applied to the Plaintiff abortion providers in those two cities. Finally, the court concludes that the ambulatory-surgical-center requirement imposes an undue burden specifically as applied to the provision of medication abortions, where any medical justification for the requirement is at its absolute weakest in comparison with the heavy burden it imposes.

In order to fashion a remedy consistent with the conclusions reached above, the court "must consider the proper place of [the act's] comprehensive and careful severability provision." *Abbott II*, 748 F.3d at 589. "Federal courts are bound to apply state law severability provisions ... [and] must preserve the valid scope of the provision to the greatest extent possible" even when considering facial invalidation of a statute. *Id.* The State urges that the Texas Legislature expressed its intent that "every application of this statute to every individual woman shall be severable from each other." Act § 1(b). The State further argues that the act's severability clause, which states, in part:

All constitutionally valid applications of this Act shall be severed from any applications that a court finds to be invalid, leaving the valid applications in force, because it is the legislature's intent and priority that the valid applications be

allowed to stand alone. Even if a reviewing court finds a provision of this Act to impose an undue burden in a large or substantial fraction of relevant cases, the applications that do not present an undue burden shall be severed from the remaining provisions and shall remain in force, and shall be treated as if the legislature had enacted a statute limited to the persons, group of persons, or circumstances for which the statute's application does not present an undue burden. . . .

Act § 10(b), operates to preclude a facial challenge to the act under existing abortion-regulation jurisprudence.

■■■ This plainly cannot be so. A state's legislature cannot purport to act to abrogate the rights guaranteed by the United States Constitution. The court further notes the sheer impossibility of severing "every application of this statute to every individual woman." However, because this court is bound to apply the severability clause contained in the act when crafting a remedy for the successful facial challenge to the ambulatory-surgical-center requirement, the court will leave in place all applications for which the statute's application does not present an undue burden. The court concludes that the ambulatory-surgical-center requirement does not act as an undue burden on Texas women when applied to the currently licensed ambulatory-surgical-center abortion providers in Texas. The requirement also does not act as an undue burden on new abortion providers that begin offering abortion services after September 1, 2014, and which were not previously licensed abortion providers. In all other applications, the court finds that the ambulatory-surgical-center requirement imposes an undue burden on Texas women of reproductive age.

### III. CONCLUSION

Examining separately the ambulatory-surgical-center and admitting-privileges requirements of House Bill 2, the court will render a final judgment:

(1) Declaring that the ambulatory-surgical-center requirement is unconstitutional because it imposes an undue burden on the right of women throughout Texas to seek a previability abortion. The court will enjoin enforcement of the provision consistent with the act's severability clause.

(2) The court will render a final judgment that the admitting-privileges requirement, as applied to the Plaintiff McAllen and El Paso clinics, is unconstitutional because it, in conjunction with the ambulatory-surgical-center requirement, imposes an undue burden on the right of women in the Rio Grande Valley, El Paso, and West Texas to seek a previability abortion. The admitting-privilege-requirement will be enjoined as applied to the McAllen and El Paso clinics.

(3) The court will render a final judgment that the act's ambulatory-surgical-center requirement, as applied to the provision of medication abortions, is unconstitutional because it imposes an undue burden on women seeking a previability abortion. The court will therefore enjoin the ambulatory-surgical-center requirement as applied to the provision of medication abortions.

However, when the two provisions are considered together, they create a scheme that effects the closing of almost all abortion clinics in Texas that were operating legally in the fall of 2013. Thus, the overall effect of the provisions is to create an impermissible obstacle as applied to all women seeking a previability abortion. The court will thus enjoin the enforcement of both provisions on the basis that they act together to create an undue burden on

a woman seeking a previability abortion by restricting access to previously available legal facilities.