# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

October 2, 2014

No. 14-50928

Lyle W. Cayce
Clerk

WHOLE WOMAN'S HEALTH;  AUSTIN WOMEN'S HEALTH CENTER;
KILLEEN WOMEN'S HEALTH CENTER; NOVA HEALTH SYSTEMS,
doing business as Reproductive Services; SHERWOOD C. LYNN, JR., M.D.,
on behalf of themselves and their patients; PAMELA J. RICHTER, D.O., on
behalf of themselves and their patients; LENDOL L. DAVIS, M.D., on behalf
of themselves and their patients,

> Plaintiffs - Appellees - Cross-Appellants

v.

DAVID LAKEY, M.D., Commissioner of the Texas Department of State
Health Services, in his Official Capacity; MARI ROBINSON, Executive
Director of the Texas Medical Board, in her Official Capacity,

> Defendants - Appellants - Cross-Appellees

Appeals from the United States District Court
for the Western District of Texas

Before SMITH, ELROD, and HIGGINSON, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

Plaintiffs[1] filed this lawsuit seeking declaratory relief and permanent
injunctions against the enforcement of two recent amendments to Texas's

---

[1] Plaintiffs in this lawsuit are some of the abortion providers in Texas: Whole
Woman's Health; Austin Women's Health Center; Killeen Women's Health Center; Nova

14-50928

laws pertaining to the performing of abortions. *See* 2013 Texas House Bill No. 2 ("H.B. 2").[2] The lawsuit was filed in April 2014, and the district court conducted a four-day bench trial August 4–7, 2014. Three weeks later, at 4:39 p.m. on August 29, 2014, the last business day before the ambulatory surgical center provision would go into effect, the district court delivered its opinion and issued a final judgment enjoining the admitting privileges requirement and ambulatory surgical center provision of H.B. 2 as to all abortion facilities in Texas. The district court also enjoined other specific applications of H.B. 2. The district court opined that together these requirements "create a brutally effective system of abortion regulation" that is unconstitutional.

Appellants (collectively "the State") appealed to the Fifth Circuit and filed an emergency motion to stay the district court's injunctions pending the resolution of their appeal. Plaintiffs filed a response, the State replied, and

---

Health Systems d/b/a Reproductive Services; and Sherwood C. Lynn, Jr., M.D., Pamela J. Richter, D.O., and Lendol L. Davis, M.D., on behalf of themselves and their patients.

Plaintiffs largely overlap with the plaintiffs in a previous challenge to H.B. 2. *See Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 951 F. Supp. 2d 891 (W.D. Tex. 2013). Whole Woman's Health, Austin Women's Health Center, Killeen Women's Health Center, and Dr. Richter all were plaintiffs in the prior lawsuit. Doctors Lynn and Davis were not parties to the earlier proceeding, but Whole Woman's Health and Austin Women's Health Center, respectively, sued on their behalf in *Abbott*. *See* Complaint ¶¶ 13–14, *Abbott*, No. 1:13-CV-862-LY (stating that clinics were suing "on behalf of" their "physicians"). Reproductive Services was not a plaintiff in *Abbott*, but Dr. Richter, its medical director, was a plaintiff in *Abbott*. *See id.* ¶ 21.

Lamar Robinson, M.D. was a named plaintiff in *Abbott* and was originally a named plaintiff in this case. However, on June 3, 2014, he and former plaintiff Abortion Advantage filed a Notice of Voluntary Dismissal. At oral argument in this case, the parties advised the panel that Dr. Robinson voluntarily dismissed his claims because he obtained admitting privileges at a hospital within thirty miles of the clinic at which he provided abortions. Planned Parenthood, the largest provider of abortion services in Texas, is not a party to this lawsuit, although it was a named plaintiff in *Abbott*.

[2] Act of July 12, 2013, 83rd Leg., 2d C.S., ch. 1, §§ 1–12, 2013 Tex. Sess. Law Serv. 4795–802 (West) (codified at Tex. Health & Safety Code Ann. §§ 171.0031, 171.041–.048, 171.061–.064, & amending §§ 245.010–.011; Tex. Occ. Code Ann. amending §§ 164.052 & 164.055).

we heard oral argument on the motion to stay on September 12, 2014. We GRANT, in part, and DENY, in part, the motion to stay the district court's injunctions pending appeal.

## I.

On July 12, 2013, the Texas Legislature passed H.B. 2. The proposed legislation for what became H.B. 2 was first filed in the Texas House of Representatives in June 2013. The House considered the bill in two public hearings. After three readings of the bill before the entire House, H.B. 2 passed with a 96-49 vote.[3] The bill was then sent to the Texas Senate, which also held a public hearing and read the bill three times.[4] The Senate engaged in a debate in which a number of senators gave speeches for and against the bill, and ultimately passed H.B. 2 with a final vote of 19-11.[5]

Two of H.B. 2's provisions are at issue here. The first requires any physician performing an abortion to have active admitting privileges at a hospital within thirty miles of the location where the abortion is performed. Tex. Health & Safety Code Ann. § 171.0031. The admitting privileges requirement went into effect on October 31, 2013.[6] The second provision

---

[3] 83rd Leg., Second Called Session, House Journal at 63, 10 Jul. 2013, *available at* http://www.journals.house.state.tx.us/hjrnl/832/pdf/83C2DAY03FINAL.PDF#page=13.

[4] 83rd    Leg.,    Second    Called    Session,    *available    at* http://www.legis.state.tx.us/BillLookup/History.aspx?LegSess=832&Bill=HB2.

[5] 83rd Leg., Second Called Session, Senate Journal at 46, 12 Jul. 2013, *available at* http://www.journals.senate.state.tx.us/sjrnl/832/pdf/83S207-12-F.PDF#page=2.

[6] The admitting privileges requirement was originally scheduled to take effect on October 29, 2013, but the district court enjoined the requirement on October 28, 2013. *See Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott (Abbott I)*, 734 F.3d 406, 409–10 (5th Cir. 2013). We stayed the district court's injunction as to the admitting privileges requirement on October 31, 2013, thus reinstating the admitting privileges requirement except as to "abortion providers who applied for admitting privileges within the grace period allowed under H.B. 2, but [were] awaiting a response from a hospital."

3

requires that all abortion clinics existing on or after September 1, 2014, comply with the same minimum standards required of ambulatory surgical centers. Tex. Health & Safety Code Ann. § 245.010.[7] The regulatory standards for ambulatory surgical centers contain two main categories: (1) physical plant, which includes architectural, electrical, plumbing, and HVAC requirements, *see* 25 Tex. Admin. Code §§ 135.51–.56, and (2) operations, which includes requirements for medical records systems, training, staffing, and cleanliness, *see* 25 Tex. Admin. Code §§ 135.4–.17, 135.26–.27.

We are familiar with legal challenges to H.B. 2. In 2013, the district court enjoined enforcement of H.B. 2's admitting privileges requirement and medication abortion provision, and the State challenged the injunction on appeal. *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 951 F. Supp. 2d 891, 909 (W.D. Tex. 2013). In that case, we granted in part[8] the State's emergency motion to stay the permanent injunction, *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott (Abbott I)*, 734 F.3d 406, 419 (5th Cir. 2014), and later upheld both the admitting privileges requirement and the medication abortion provision as facially constitutional.

---

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott (Abbott II)*, 748 F.3d 583, 600 (5th Cir. 2014).

[7] These standards are codified at Tex. Health & Safety Code § 243.010. Given H.B. 2's enactment date, July 12, 2013, clinics had fourteen months within which to comply with these standards before the ambulatory surgical center provision became effective.

[8] We granted a stay of the district court's determination that the admitting privileges requirement was facially invalid. We denied a request for a stay of the district court's decision to create a health exception to the medication abortion provision. In denying the stay of the medication abortion provision, we noted that "we do not prejudge the outcome of these issues on appeal. We conclude only that a stay of the injunction on these grounds pending appeal is not appropriate." *Abbott I*, 734 F.3d at 418. Indeed, at the merits stage, we concluded that the statute regulating medication abortions did not facially require a court-imposed exception. *Abbott II*, 748 F.3d at 600–04.

*Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott (Abbott II)*, 748 F.3d 583, 605 (5th Cir. 2014).

In the instant lawsuit, Plaintiffs challenge the admitting privileges requirement, this time not on its face, but as applied to two specific clinics. Whole Woman's Health and Dr. Sherwood C. Lynn, Jr. challenge the requirement as applied to the clinic operated by Whole Woman's Health in McAllen. Nova Health Systems and Dr. Pamela J. Richter challenge the requirement as applied to the clinic operated by Reproductive Services in El Paso. Plaintiffs also challenge the ambulatory surgical center provision as unconstitutional on its face, and as applied to the clinics in McAllen and El Paso, and as applied to medication abortion.

The district court's judgment extended beyond Plaintiffs' claims and the relief requested.[9] Not only did the district court enjoin the admitting privileges requirement as applied to the McAllen and El Paso clinics, as Plaintiffs sought, the district court determined that the admitting privileges requirement "create[d] an impermissible obstacle *as applied to all women* seeking a previability abortion." *Whole Woman's Health v. Lakey*, No. 1:14-CV-284-LY, 2014 WL 4346480 at *2 (W.D. Tex. Aug. 29, 2014) (hereinafter [*Whole Woman's Health Judgment*] (emphasis added); *see also Whole Woman's Health v. Lakey*, No. 1:14-CV-284-LY, slip op. at 4 (W.D. Tex. Aug. 29, 2014) (The two requirements "operate together to place an unconstitutional undue burden on women throughout Texas.").

As to the ambulatory surgical center provision, the district court's opinion and final judgment are unclear. The final judgment declares that the ambulatory surgical center provision is unconstitutional "as to all abortion

---

[9] Moreover, the district court's ruling contravened *Abbott II*, which had already upheld the admitting privileges requirement as facially constitutional.

facilities in the State" with two exceptions: (1) facilities already licensed and meeting the minimum standards; and (2) all future abortion facilities commencing operation after the effective date. *Whole Woman's Health Judgment* at \*1. Confusingly, the judgment further declares that the ambulatory surgical center provision is unconstitutional and that when considered together with the admitting privileges requirement, "create[s] an impermissible obstacle as applied to all women seeking a previability abortion." *Id.* at \*2. In their briefs and at oral argument, the parties expressed uncertainty as to whether the district court intended to invalidate this provision on its face or, according to the earlier language, as applied to some clinics in the state.

It is also unclear whether the district court specifically determined that the provision is unconstitutional as applied to the McAllen and El Paso clinics. While Plaintiffs made these as-applied challenges, the district court did not directly address them in either the declarations section of its final judgment or the conclusion of its opinion.[10] However, the district court indicated in the introductory parts of its opinion and judgment that it intended to do so. *See Whole Woman's Health Judgment* at \*1 ("[T]he . . . ambulatory-surgical-center requirements of House Bill 2 as applied to [the] clinic[s] in McAllen [and] El Paso . . . are unconstitutional"); *Whole Woman's Health*, slip op. at 4 (declaring that the ambulatory surgical center provision, "as applied to the McAllen and El Paso clinics, place[s] an unconstitutional undue burden on women"); *id.* at 16 (stating that the requirement, "as applied to the Rio Grande Valley and El Paso clinics, [is] constitutionally

---

[10] A similar issue arose in the *Abbott* case, when the district court issued a judgment broader in scope than the determinations in its opinion. *Abbott I*, 734 F.3d at 410 ("The final judgment enjoined the medication abortions provision to a greater extent than the court had indicated it would in its Memorandum Opinion."). In that case, we narrowed the injunction in the judgment. *Id.* at 419.

6

impermissible"); *see also id.* at 19 ("In all other applications, the court finds that the ambulatory-surgical-center requirement imposes an undue burden on Texas women of reproductive age."). We note that the broad judgment "as applied to all women" logically would include the McAllen and El Paso clinics, even though the district court did not specifically address in its conclusions and judgment Plaintiffs' as-applied claims for these locations.

To alleviate confusion and to fairly address the State's emergency motion and Plaintiffs' response, we consider whether to stay injunctions of both the admitting privileges requirement and the ambulatory surgical center provision on their face—or in the district court's words, "as applied to all women in Texas"—and as applied to the McAllen and El Paso clinics. In addition, we will address the injunction of the ambulatory surgical center provision as applied to medication abortions. *See Whole Woman's Health Judgment* at *2.

## II.

"Factual findings by the district court are typically reviewed for clear error." *City of Alexandria v. Brown,* 740 F.3d 339, 352 (5th Cir. 2014). The district court found, after trial with witness credibility determinations, that Texas had over forty abortion clinics prior to the enactment of H.B. 2, and that after the ambulatory surgical center provision takes effect, only seven or eight clinics will remain, representing more than an 80% reduction in clinics statewide in nearly fourteen months, with a 100% reduction in clinics west and south of San Antonio. The district court further found that there was no credible evidence of medical or health benefit associated with the ambulatory surgical center provision in the abortion context.

The district court also found: (1) the construction costs of bringing existing clinics into compliance with the minimum standards for ambulatory

surgical centers "will undisputedly approach 1 million dollars and will most likely exceed 1.5 million dollars"; (2) "the cost of acquiring land and constructing a new compliant clinic will likely exceed three million dollars" for existing clinics that cannot comply due to physical space limitations; (3) the enforcement of both challenged H.B. 2 provisions will increase women's travel distances to clinics; for example, 1.3 million women of reproductive age in Texas will live more than 100 miles from a clinic, 900,000 women will live more than 150 miles from a clinic, 750,000 women will live more than 200 miles from a clinic, and some women will live as far as 500 miles from a clinic; (4) the burdens of increased travel combine with "practical concerns includ[ing] lack of availability of child care, unreliability of transportation, unavailability of appointments at abortion facilities, unavailability of time off from work, immigration status and inability to pass border checkpoints, poverty level, [and] the time and expense involved in traveling long distances"; and (5) the remaining seven or eight clinics likely will not have the capacity to perform 60,000–72,000 abortions per year in Texas.

### III.

We consider four factors in deciding whether to grant a stay pending appeal:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Abbott I*, 734 F.3d at 410 (quoting *Nken v. Holder*, 556 U.S. 418, 425–26 (2009)).  A stay "is not a matter of right, even if irreparable injury might otherwise result to the appellant." *Nken*, 556 U.S. at 427.

The State initially filed a motion to stay in this court and, shortly thereafter, filed the same motion with the district court.  The district court

denied the motion "for substantially the reasons stated in its memorandum opinion." Plaintiffs do not object to the order in which the State filed its motions and agree that the present motion is properly before us. *See Abbott I*, 734 F.3d at 410.

## IV.

"Before viability, a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy." *Gonzales v. Carhart*, 550 U.S. 124, 146 (2007) (internal quotation marks omitted). Nor may a State "impose upon this right an undue burden, which exists if a regulation's purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." *Id.* (internal quotation marks omitted); *see also Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846 (1992)). To determine the constitutionality of a state law, we ask "whether the Act, measured by its text in this facial attack, imposes a substantial obstacle to . . . previability[] abortions." *Carhart*, 550 U.S. at 156.

Following *Carhart* and *Casey*, our circuit conducts a two-step approach, first applying a rational basis test, then independently determining if the burden on a woman's choice is undue. *See Abbott II*, 748 F.3d at 593–94, 597 ("Even though the state articulated a rational basis for the law . . . [Plaintiff] could succeed if the effect of the law substantially burdened women's access to abortion in Texas."); *see also Carhart*, 550 U.S. at 158 ("Where it has a rational basis to act, and it does not impose an undue burden, the State may use its regulatory power . . . in furtherance of its legitimate interests . . . .").

## A.

Though Plaintiffs sought only as-applied relief from the admitting privileges requirement, limited to two abortion clinics—one in El Paso and one in McAllen—the district court, in its final judgment, appears to have

facially invalidated the admitting privileges requirement throughout Texas. *See Whole Woman's Health Judgment* at \*2 ("[T]he two portions of Texas Health and Safety Code, Sections 245.010(a) [ambulatory surgical center provision] and 171.0031(a)(1) [admitting privileges requirement], create an impermissible obstacle *as applied to all* women seeking a previability abortion.") (emphasis added); *see also Whole Woman's Health*, slip op. at 21 (noting that the admitting privileges requirement and ambulatory surgical center provision are unconstitutional as to *all women in the state* seeking a previability abortion because they "act together to create an undue burden on a woman seeking a previability abortion by restricting access to previously available legal facilities"). This was inappropriate because Plaintiffs did not request that relief. *See Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 (5th Cir. 2014) (narrowing the district court's injunction to correspond with the scope of the plaintiffs' requested relief). Furthermore, the district court's facial invalidation of the admitting privileges requirement is directly contrary to this circuit's precedent. *Abbott II* specifically upheld the facial constitutionality of the admitting privileges requirement. 748 F.3d at 599–600.

## B.

We now turn to the central question presented by this emergency motion: whether the State has shown a likelihood of success regarding whether the ambulatory surgical center provision is unconstitutional on its face. We conclude that it has.

As explained in *Abbott II*, if the State establishes that a law is rationally related to a legitimate state interest, we do not second guess the legislature regarding the law's wisdom or effectiveness. 748 F.3d at 594. Nor

is the State "required to prove that the objective of the law would be fulfilled." *Id.* (internal quotation marks omitted).

The district court concluded that H.B. 2, including both provisions at issue here, "surmount[ed] the low bar of rational-basis review." *Whole Woman's Health*, slip op. at 6. We agree with the district court's conclusion that the ambulatory surgical center provision satisfies rational basis review. In addition, no party challenges the district court's conclusion.

Thus, our review will focus on the second step of this circuit's approach; namely, whether this provision imposes an undue burden. The undue burden inquiry looks to whether the challenged provision has either "the *purpose* or *effect* of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey*, 505 U.S. at 877 (emphasis added). If it does, it is unconstitutional. *Id.*

### 1.

We begin with the purpose inquiry. "[P]laintiffs bore the burden of attacking the State's purpose here," and the State has shown a strong likelihood that Plaintiffs failed to meet that burden. *Abbott II*, 748 F.3d at 597; *see also Abbott I*, 734 F.3d at 413.

The district court determined that "the ambulatory-surgical-center requirement was intended to close existing licensed abortion clinics." *Whole Woman's Health*, slip op. at 16. To support its conclusion, the district court determined that H.B. 2 treats abortion facilities in a "disparate and arbitrary" manner by not including an exception to the ambulatory surgical center provision for previously licensed abortion providers. According to the district court, "other types of ambulatory-surgical facilities are frequently granted waivers or are grandfathered due to construction dates that predate

the newer construction requirements." *Id.* at 10 (citing 25 Tex. Admin. Code § 135.51(a)).

The State argues that the district court misunderstood the relevant provision in the governing Texas regulation. As the State reads the provision, H.B. 2 does not treat abortion facilities disparately from other ambulatory surgical centers in this respect. *See* 25 Tex. Admin. Code § 135.51(a). According to the State, there is no ambulatory surgical center exemption for any facility within the statutorily-defined subset requiring licensure, regardless of whether it provides abortions. The provision cited by the district court provides an exemption to *any* facility previously licensed as an ambulatory surgical center that failed to comply with new building code requirements amended in June 2009. Any such facility, regardless of whether it provides abortions, qualifies for the exemption. Based on our review of the relevant provision, we agree with the State that ambulatory surgical centers providing abortions are not treated differently from other ambulatory surgical centers.

Besides its view of the above regulation, the district court cited no record evidence to support its determination that the ambulatory surgical center provision was enacted for the purpose of imposing an undue burden on women seeking abortions, nor did it make any factual finding regarding an improper purpose. The Texas Legislature's stated purpose was to improve patient safety. *See, e.g.*, Senate Comm. On Health & Human Servs., Bill Analysis, Tex. H.B. 2, 83d Leg., 2d C.S. 1–2 (2013) ("H.B. 2 seeks to increase the health and safety" of abortion patients and to provide them with "the highest standard of health care"). As we observed in *Abbott I*, the State of Texas has an "interest in protecting the health of women who undergo abortion procedures." 734 F.3d at 413; *see also Carhart*, 550 U.S. at 157

12

("There can be no doubt the government has an interest in protecting the integrity and ethics of the medical profession." (internal quotation marks omitted)).  Courts are not permitted to second guess a legislature's stated purposes absent clear and compelling evidence to the contrary.  *See Kansas v. Hendricks*, 521 U.S. 346, 361 (1997) ("[W]e ordinarily defer to the legislature's stated intent."); *Flemming v. Nestor*, 363 U.S. 603, 617 (1960) ("[O]nly the clearest proof could suffice to establish the unconstitutionality of a statute on [the] ground of [improper legislative motive].").  Such evidence simply does not appear in the record here.

Alternatively, the district court opined that it was "not required" to find actual evidence of improper purpose because H.B. 2's ambulatory surgical center provision has the *effect* of creating an undue burden.  *Whole Woman's Health*, slip op. at 16.  To the extent the district court found an improper purpose based on the law's *effect*, the State is likely to succeed on the merits.  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (noting that the purpose and effect of undue burden are two different inquiries and there must be "*some* evidence of that improper purpose"); *Abbott II*, 748 F.3d at 597 ("[T]he plaintiffs offered no evidence implying that the State enacted the admitting privileges provision in order to limit abortions . . . . There is thus no basis for a finding of impermissible purpose under *Casey*.").

**2.**

We now evaluate whether the State has shown a likelihood of success on the merits of whether the ambulatory surgical center provision "has the *effect* of imposing an unconstitutional burden" sufficient to justify a facial invalidation.  *Carhart*, 550 U.S. at 161 (emphasis added).  The State has made such a showing.

Facial challenges relying on the effects of a law "impose[] a heavy burden upon the part[y] maintaining the suit." *Abbott I*, 734 F.3d at 414 (second alteration in original) (quoting *Carhart*, 550 U.S. at 167) (internal quotation marks omitted); *Abbott II*, 748 F.3d at 604 (same). In *Carhart*, the Supreme Court recognized the existence of divergent views as to "[w]hat that burden consists of in the specific context of abortion statutes . . . ." 550 U.S. at 167. It is well-settled in this circuit that "[a] facial challenge will succeed only where the plaintiff shows that there is no set of circumstances under which the statute would be constitutional." *Barnes v. Mississippi*, 992 F.2d 1335, 1342 (5th Cir. 1993); *see also Abbott II*, 748 F.3d at 588 ("Standard principles of constitutional adjudication require courts to engage in facial invalidation only if no possible application of the challenged law would be constitutional."). The Supreme Court uses the same "no set of circumstances" rule in general for facial challenges. *See United States v. Salerno*, 481 U.S. 739, 745 (1987). However, as we noted in *Abbott II*, it is not clear whether the Supreme Court applies this general rule in abortion cases. 748 F.3d at 588.

In *Casey*, the controlling plurality held that an abortion-regulating statute would fail constitutional muster if, "in a *large fraction of the cases* in which it is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." 505 U.S. at 895 (emphasis added). In earlier abortion cases, the Court used the "no set of circumstances" approach. *See, e.g., Rust v. Sullivan*, 500 U.S. 173, 183 (1991); *Ohio v. Akron Ctr. for Reprod. Health*, 497 U.S. 502, 514 (1990). The more recent *Carhart* majority did not choose between "no set of circumstances" and "large fraction," but instead upheld the statute in question on the basis that the facial challenge could not satisfy either standard. 550 U.S. at 167–68 ("We need not resolve that

debate." *Id.* at 167.).  We will do the same here, as we did in *Abbott I* and *Abbott II*, and "apply the 'large fraction' nomenclature for the sake of argument only, without casting doubt on the general rule." *Abbott II*, 748 F.3d at 588–89; *see also Abbott I*, 734 F.3d at 414.

The ambulatory surgical center provision applies to all clinics performing abortions.  Every woman in Texas who seeks an abortion will be affected to some degree by this requirement because it effectively narrows her options for where to obtain an abortion.  As the parties stipulated at trial, six licensed ambulatory surgical centers "will not be prevented by the ambulatory surgical center [provision] of HB 2 from performing abortions." These are located in Austin, Dallas, Fort Worth, Houston, and San Antonio. The parties also stipulated that Planned Parenthood has obtained a license to open a new ambulatory surgical center in Dallas, and announced its intention to open another one in San Antonio.  However, the parties further stipulated that all other abortion facilities now licensed by the State of Texas cannot currently comply with the provision.  The district court concluded that this reduction in supply of clinics was an undue burden and facially invalidated the ambulatory surgical center provision.  In doing so, the district court applied neither the Fifth Circuit's "no set of circumstances" test nor *Casey*'s "large fraction" test.  Instead, the district court found that "a *significant number* of the reproductive-age female population of Texas will need to travel considerably further in order to exercise its right to a legal previability abortion." *Whole Woman's Health*, slip op. at 9 (emphasis added).  The district court "conclude[d] that the practical impact on Texas women due to the clinics' closure statewide would operate for a *significant number* of women in Texas just as drastically as a complete ban on abortion." *Id.* at 11 (emphasis added).  However, under this circuit's precedent, and *Carhart*, a

15

"significant number" is insufficient unless it amounts to a "large fraction." *See Abbott II*, 748 F.3d at 600 ("[T]he regulation will not affect a significant (much less 'large') fraction of such women . . . .").

The district court also erred when it balanced the efficacy of the ambulatory surgical center provision against the burdens the provision imposed. In the district court's view, "the severity of the burden imposed by both requirements is not balanced by the weight of the interests underlying them." *Whole Woman's Health*, slip op. at 13. As support for this proposition, the court evaluated whether the ambulatory surgical center provision would actually improve women's health and safety. *Id.* at 14–15 ("The court concludes that it is unlikely that the stated goal of the requirement—improving women's health—will actually come to pass."). This approach contravenes our precedent. In our circuit, we do not balance the wisdom or effectiveness of a law against the burdens the law imposes. *See Abbott II*, 748 F.3d at 593–94, 597 (conducting a two-step approach, first determining whether the law at issue satisfies rational basis, then whether it places a substantial obstacle in the path of a large fraction of women seeking abortions); *see also Harris v. McRae*, 448 U.S. 297, 325–26 (1980) ("It is not the mission of this Court or any other to decide whether the balance of competing interests . . . is wise social policy.").

The district court's weighing of the interests basically boils down to the district court's own view that the facilities are already safe for women and that the ambulatory surgical center provision, when implemented, will not serve to promote women's health. However, *Abbott II* discusses in detail the perils of second-guessing the wisdom of the legislature in a constitutional challenge:

> If legislators' predictions about a law fail to serve their purpose, the law can be changed. Once the courts have held a law

16

unconstitutional, however, only a constitutional amendment, or the wisdom of a majority of justices overcoming the strong pull of *stare decisis*, will permit that or similar laws to again take effect. *Abbott II*, 748 F.3d at 594. Moreover, the district court's approach ratchets up rational basis review into a pseudo-strict-scrutiny approach by examining whether the law advances the State's asserted purpose.[11] Under our precedent, we have no authority by which to turn rational basis into strict scrutiny under the guise of the undue burden inquiry.

Plaintiffs argue that the district court's balancing approach is used by other circuits. We agree with Plaintiffs that some circuits have used the balancing test to enjoin abortion regulations; other circuits—including ours— have not. *Compare Planned Parenthood Ariz., Inc. v. Humble*, 753 F.3d 905, 914 (9th Cir. 2014), *and Planned Parenthood of Wisc., Inc. v. Van Hollen*, 738 F.3d 786, 791–99 (7th Cir. 2013), *with Abbott II*, 748 F.3d at 593–94, 597, *Planned Parenthood Sw. Ohio Region v. DeWine*, 696 F.3d 490, 515 (6th Cir. 2012), *Greenville Women's Clinic v. Bryant*, 222 F.3d 157 (4th Cir. 2000), *and Women's Health Center of W. Cnty., Inc. v. Webster*, 871 F.2d 1377 (8th Cir. 1989). We are bound to follow our circuit's approach.

In addition, Plaintiffs argue that *Barnes v. Mississippi*, 992 F.2d 1335 (5th Cir. 1993) supports a balancing approach.[12] However, a careful reading of *Barnes* establishes that it does not support Plaintiffs' argument. In *Barnes*, we cited *Casey* for the proposition that "the constitutionality of an

---

[11] This is particularly problematic in a facial challenge to a newly enacted law. "Most legislation deals ultimately in probabilities, the estimation of the people's representatives that a law will be beneficial to the community. Success often cannot be 'proven' in advance. The court may not replace legislative predictions or calculations of probabilities with its own, else it usurps the legislative power." *Abbott II*, 748 F.3d at 594 (citing *Heller v. Doe*, 509 U.S. 312, 319 (1993)).

[12] The concurring and dissenting opinion seems to agree with Plaintiffs' and the district court's views on the balancing approach, as well as their interpretation of *Barnes*.

17

abortion regulation . . . turns on an examination of the *importance* of the state's interests in the regulation and the severity of the burden that regulation imposes on a woman's right to seek an abortion." 992 F.2d at 1339 (emphasis added). We then analyzed the *importance* of the State's interest in parental involvement statutes, without considering the extent to which the challenged law actually advanced that interest. Likewise here, the health of women seeking abortions is an important purpose. *See Abbott II*, 748 F.3d at 594–96. Our only remaining task is to analyze the severity of the burden the regulation imposes on women's right to seek abortions.

The district court's failure to apply the "large fraction" test, and its reliance on its own balancing of the State's justifications against the burdens imposed by the law, weigh in favor of the State's strong likelihood of success on the merits. Moreover, application of the "large fraction" test to the evidence before us further supports the State's position that the evidence at the four-day trial is insufficient to show that a "large fraction" of women seeking abortions would face an undue burden on account of the ambulatory surgical center provision.

Plaintiffs' expert, Dr. Daniel Grossman, opined that the ambulatory surgical center provision would increase driving distances for women generally, noting that after the provision becomes effective, 900,000 out of approximately 5.4 million women of reproductive age in Texas would live at least 150 miles from the nearest clinic. *Whole Woman's Health*, slip op. at 8–9. He did not testify specifically about how many women seeking abortions would have to drive more than 150 miles or whether that number would amount to a large fraction. *See Abbott II*, 748 F.3d at 583 ("[A]n increase of travel of less than 150 miles for some women is not an undue burden under *Casey*.") (citing *Abbott I*, 734 F.3d at 415). Assuming that women seeking

18

abortions are proportionally distributed across the state, Dr. Grossman's evidence suggests that approximately one out of six (16.7%) women seeking an abortion will live more than 150 miles from the nearest clinic.[13]

Even assuming, *arguendo*, that 150 miles is the relevant cut-off, this is nowhere near a "large fraction." *See Abbott II*, 748 F.3d at 600. As discussed above, the *Casey* plurality, in using the "large fraction" nomenclature, departed from the general standard for facial challenges. The general standard for facial challenges allows courts to facially invalidate a statute only if "no possible application of the challenged law would be constitutional." *Abbott II*, 748 F.3d at 588. In other words, the law must be unconstitutional in 100% of its applications. We decline to interpret *Casey* as changing the threshold for facial challenges from 100% to 17%.[14]

Plaintiffs argue that the appropriate denominator in the large fraction analysis consists only of women "who could have accessed abortion services in Texas prior to implementation of the challenged requirements, but who will face increased obstacles as a result of the law." To narrow the denominator in this way—to essentially only those women who Plaintiffs argue will face an undue burden—ignores precedent. *Casey* itself counsels that the

---

[13] The State's expert, Todd Giberson, testified that "90.6% of Texas women ages 15-44 live within 150 miles of [an ambulatory surgical center abortion facility] or live in an area that is not within 150 miles of an abortion provider due to reasons not alleged to be related to the Act." This testimony was not rebutted, but the district court found Mr. Giberson to be less credible. *Whole Woman's Health*, slip op. at 9 n.4. Even if we ignore Mr. Giberson's testimony and rely on the 17% figure gleaned from Dr. Grossman's testimony, Plaintiffs cannot satisfy the large fraction test.

[14] The concurring and dissenting opinion inexplicably contends that, on this record, the large fraction test is satisfied. This is baffling and ignores the baseline from which the large fraction test was derived. It also ignores *Abbott II*'s guidance that a burden that "does not fall on the vast majority of Texas women" does not meet the large fraction test. 748 F.3d at 600. Moreover, the concurring and dissenting opinion fails to justify its reliance on the "large fraction" test to the exclusion of the "no set of circumstances" test, which, as discussed, is the law of our circuit. *See Barnes*, 992 F.2d at 1342; *Abbott II*, 748 F.3d at 588.

19

denominator should encompass all women "for whom the law is a restriction." *Casey*, 505 U.S. at 894 (involving a spousal consent requirement that applied to married women who did not want to obtain consent). This is also the approach that our circuit used in *Abbott II*. 748 F.3d at 598 (using a denominator of "women seeking an abortion in Texas" when addressing a facial challenge of H.B. 2 under the large fraction test). Here, the ambulatory surgical center requirement applies to every abortion clinic in the State, limiting the options for all women in Texas who seek an abortion. The appropriate denominator thus includes all women affected by these limited options. Moreover, Plaintiffs' suggested approach would make the large fraction test merely a tautology, always resulting in a large fraction. The denominator would be women that Plaintiffs claim are unduly burdened by the statute, and the numerator would be the same.[15]

Based on unspecific testimony at trial, the district court also noted "practical concerns" that combine with increased travel distances, particularly for disadvantaged, minority, and immigrant populations. *See Whole Woman's Health*, slip op. at 11–12 (listing "lack of availability of child care, unreliability of transportation, unavailability of appointments at abortion facilities, unavailability of time off from work, immigration status and inability to pass border checkpoints, poverty level, the time and expense involved in traveling long distances, and other inarticulable psychological obstacles." *Id.* at 11.). We do not doubt that women in poverty face greater difficulties. However, to sustain a facial challenge, the Supreme Court and this circuit require Plaintiffs to establish that the law itself imposes an undue

---

[15] Here, we use the same denominator as the panel in *Abbott II*—women seeking an abortion in Texas. We note that even if the denominator excluded women who will not have to change clinics as a result of the ambulatory surgical center provision—for whom the provision arguably is not a restriction—Plaintiffs offered no evidence from which we could conclude that a large fraction of the remaining women will face an undue burden.

burden on at least a large fraction of women.  Plaintiffs have not done so here.

The district court also relied on its own determination that the ambulatory surgical center provision would cause a shortage in capacity for the remaining licensed clinics.  The district court found that 60,000–72,000 abortions were performed annually in previous years.  *Id.* at 8.  After the ambulatory surgical center provision goes into effect, it is undisputed that seven or eight clinics will remain.  *Id.* at 11.  Based on Dr. Grossman's testimony, the district court then determined that each remaining clinic would have to manage, on average, 7,500–10,000 patients a year, over 1,200 patients per month in some cases.  *Id.*  The district court found that handling this high a caseload "stretches credulity."

However, the district court did not make any findings of fact to support its conclusion.  Nor could it, given that Dr. Grossman's testimony is *ipse dixit* and the record lacks any actual evidence regarding the current or future capacity of the eight clinics.[16]    Dr. Grossman simply assumes, without evidence, that these centers are currently operating at full capacity and will be unable to accommodate any increased demand.  Likewise, Dr. Grossman did not consider how many physicians with admitting privileges from non-ambulatory surgical centers will begin providing abortions at the ambulatory surgical center clinics, thereby increasing those clinics' capacities.  It also

---

[16] In *Abbott II*, the testimony of an expert who was part of the same research team as Dr. Grossman offered similarly unsupported conjecture when predicting that, as a result of the *admitting privileges requirement*, approximately 22,000 women in Texas would be unable to obtain abortions.  On cross-examination in this case, Dr. Grossman admitted that his colleague's earlier predictions proved to be inaccurate.  Dr. Grossman testified in this case that there had been a decrease of only 9,200 abortions and that the decrease could not be wholly ascribed to the admitting privileges requirement.    Indeed, Dr. Grossman acknowledged on cross-examination that in his team's published, peer-reviewed article, the researchers qualified their findings by noting that they "cannot prove causality between the State restrictions and falling abortion rate."

does not appear from the record that Dr. Grossman considered the possibility of additional capacity resulting from new clinics' being built, nor did he consider that the demand for abortion services in Texas may decrease in the future, as it has done nationally over the past several years. Furthermore, the record lacks evidence that the previous closures resulting from the admitting privileges requirement have caused women to be turned away from clinics. Without any evidence on these points, Plaintiffs do not appear to have met their burden to show that the ambulatory surgical center provision will result in insufficient clinic capacity that will impose an undue burden on a large fraction of women.[17]

The evidence does indicate, without specificity, that by requiring all abortion clinics to meet the minimum standards of ambulatory surgical centers, the overall cost of accessing an abortion provider will likely increase. However, as the Supreme Court recognized in *Carhart*, and we observed in *Abbott I*, "'[t]he fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it.'" *Abbott I*, 734 F.3d at 413 (alteration in original) (quoting *Carhart*, 550 U.S. at 157–58).

---

[17] The concurring and dissenting opinion speculates that patients seeking abortions will face delays comparable to those discussed by the Seventh Circuit in *Planned Parenthood of Wisc., Inc. v. Van Hollen*, 738 F.3d 786 (7th Cir. 2013). Here, there is no evidence in the record that women have faced delays, have been turned away for lack of capacity, or will face delays in the future.

In sum, the State has met its burden as to the district court's facial invalidation of the admitting privileges requirement and the ambulatory surgical center provision.[18]

## V.

Finally, we address the district court's injunctions of both requirements as applied to clinics in McAllen and El Paso, as well as the ambulatory surgical center provision as applied to medication abortion, and the State's likelihood of success on the merits of each. We conclude that the State has met its burden as to each, with the exception of the ambulatory surgical center provision as applied to El Paso.

## A.

The State has shown a strong likelihood of success on the merits of its argument that Plaintiffs' as-applied challenges to the admitting privileges requirement are barred by res judicata. In the interests of efficiency and finality, the doctrine of res judicata bars litigation of claims that have been litigated or could have been raised in a prior lawsuit. In the lawsuit giving rise to *Abbott I* and *Abbott II*, Plaintiffs facially challenged the admitting privileges requirement. They also could have brought, but chose not to bring, as-applied challenges with regard to clinics in El Paso and McAllen.[19] Their choice not to include the as-applied challenges in their previous lawsuit likely precludes them from pursuing that challenge now. *See Brown v. Felsen*, 442 U.S. 127, 131 (1979) ("Res judicata prevents litigation of all grounds for, or

---

[18] Even if the facial invalidation of the ambulatory surgical center provision were upheld, the injunction should still be stayed as to the operational requirements of the provision. *See infra* Part V.C.

[19] Plaintiffs did bring simultaneous facial and as-applied challenges to the ambulatory surgical center requirement of H.B. 2.

defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding.").

To be sure, res judicata bars a subsequent lawsuit only if, *inter alia*, the same "claim or cause of action" is involved in both lawsuits. *Petro-Hunt, L.L.C. v. United States*, 365 F.3d 385, 395 (5th Cir. 2004).[20]  To determine whether two lawsuits involve the same "claim or cause of action" for purposes of res judicata, the Fifth Circuit applies the transactional test of the Restatement (Second) of Judgments, § 24.  *Id.*  Under that test, the "critical issue is whether the two actions under consideration are based on 'the *same nucleus of operative facts.*'"  *Southmark Corp. v. Coopers & Lybrand* (*In re Southmark Corp.*), 163 F.3d 925, 934 (5th Cir. 1999) (quoting *Bank of Lafayette v. Baudoin* (*In re Baudoin*), 981 F.2d 736, 743 (5th Cir. 1993)).  If the facts on which the second lawsuit is based are the same as those prevailing at the time of the first lawsuit, the two lawsuits involve the same "claim or cause of action" for purposes of res judicata.

Plaintiffs contended, and the district court agreed, that the present lawsuit relies on a different set of operative facts than did the pre-enforcement challenge because the abortion clinics in McAllen and El Paso have now ceased providing abortion services.  However, our precedent dictates that changed circumstances prevent the application of res judicata only if the change is "significant" and creates "new legal conditions." *Hernandez v. City of Lafayette*, 699 F.2d 734, 737 (5th Cir. 1983).  The closure of the clinics in McAllen and El Paso does not create "new legal conditions" because, in the pre-enforcement challenge, Plaintiffs alleged that the McAllen and El Paso clinics would shut down upon implementation of H.B. 2.

---

[20] Res judicata also requires that the parties are identical to, or in privity with, the parties in the previous lawsuit.  Plaintiffs do not dispute that they are identical to or in privity with the plaintiffs in *Abbott I and II.*

24

Plaintiffs could have relied on these allegations to bring the very same as-applied challenge they now pursue; they simply chose not to do so.

The district court stated that "it was not known in late October 2013 [i.e., when the district court entered its judgment in *Abbott*] that the McAllen and El Paso clinics' physicians would ultimately be unable to obtain admitting privileges despite efforts to secure them." However, the Complaint in *Abbott*, which was filed in September 2013, expressly alleged that those clinics would close if the admitting privileges requirement took effect. Indeed, the physicians who performed abortions at those two facilities were named plaintiffs in *Abbott*, further undermining any suggestion that the closure of the clinics was a significant or unexpected change of facts.[21] Thus, Plaintiffs' as-applied challenges to the admitting privileges requirement are likely barred by res judicata.

## B.

Even if Plaintiffs' claims are not barred by res judicata, the State is still likely to succeed on the merits of whether the admitting privileges requirement and the ambulatory surgical center provision, as applied to the McAllen clinic, have the effect of imposing an undue burden on women in the Rio Grande Valley.

The admitting privileges requirement went into effect in October 2013. Since that time, abortion clinics have remained open in all of the major metropolitan areas across the state. The district court found that the number of total clinics in Texas decreased from more than forty clinics to fewer than

---

[21] In the district court, plaintiffs also argued that res judicata does not bar their as-applied challenge because "the panel's decision in *Abbott* . . . is not yet final." However, unless and until *Abbott II* is vacated, it is binding precedent that this panel is not at liberty to ignore. Under this circuit's rule of orderliness, "only an intervening change in the law (such as by a Supreme Court case) permits a subsequent panel to decline to follow a prior Fifth Circuit precedent." *United States v. Alcantar*, 733 F.3d 143, 145 (5th Cir. 2013).

thirty clinics "leading up to and in the wake of enforcement of the admitting-privileges requirement." *Whole Woman's Health*, slip op. at 8; *but see Abbott II*, 748 F.3d at 599 (noting that a number of these clinics had closed for reasons other than the admitting privileges requirement). Importantly, Dr. Grossman stated in his declaration that he was not "offering any opinion on the cause of the decline in the number of abortion facilities from November 2012 to April 2014." The district court further found that no abortion providers are in operation in a number of cities, including, for example, McAllen, Lubbock, Midland, and Waco. *Whole Woman's Health*, slip op. at 8. The ambulatory surgical center provision was set to go into effect on September 1, 2014, which the district court found would cause even more closures, leaving only seven or eight licensed providers. *Id.* at 10–11.

The district court found that the McAllen clinic closed as a result of the admitting privileges requirement. *Id.* at 8. Since that time, the women who would have otherwise been served by the McAllen clinic had to look elsewhere for the procedure. As stated in his trial declaration, Dr. Grossman identified more than 1,000 women from the Valley who sought abortions between November 2013 and April 2014, and traveled to nearby cities where clinics remained open. During that period, approximately 50% of those women traveled to Corpus Christi, 25% traveled to Houston, 15% percent to San Antonio, and 10% to a location even farther from the Valley.

In *Abbott II*, relying on *Casey*, we held that having to travel 150 miles from the Rio Grande Valley to Corpus Christi is not an undue burden. *Abbott II*, 748 F.3d at 598. Indeed, *Casey* permitted even greater travel distances, as

it upheld a 24-hour waiting period that doubled driving times, increasing the drive for some women from three hours to six hours.[22]  *See id.*

While the clinic in Corpus Christi remained open after the admitting privileges requirement went into effect, it currently does not comply with the ambulatory surgical center provision.  The district court found that once the provision takes effect, the clinic nearest to the Rio Grande Valley will be in San Antonio, between 230 and 250 miles away.   Therefore, we must determine whether the State is likely to prevail on its argument that this incremental increase of 100 miles in distance does not constitute an undue burden.

At trial, Plaintiffs had the burden of showing that the additional travel distance to San Antonio constituted an undue burden.  As noted above, the record indicates that 50% of the more than 1,000 women in Dr. Grossman's study who resided in the Rio Grande Valley and were seeking abortions traveled to San Antonio and Houston (which is even farther than San Antonio) even when the Corpus Christi clinic was still in operation.  Plaintiffs also had the burden, which they failed to meet, of showing that clinics in San Antonio and other nearby cities would be unable to manage the additional demand for abortions caused by closures.  Indeed, women from McAllen have been traveling outside their city for nearly a year and Plaintiffs made no showing that clinics in San Antonio (or any other city) have been deluged. Considering that *Casey* upheld travel times of six hours (increases of three hours) and that women in the Rio Grande Valley traveling to San Antonio have less total travel time than women affected by the Pennsylvania law in

---

[22] It is also important to note that Texas has a 24-hour waiting period, which Plaintiffs do not challenge here, but women who must travel more than 100 miles to a clinic are exempt.  Tex. Health & Safety Code § 171.012(a)(4).

*Casey*, the State has a strong likelihood of success on its appeal of the injunctions of both requirements as applied to the McAllen clinic.[23]

### C.

As to the El Paso clinic, we grant, in part, and deny, in part, the State's motion to stay the district court's injunction of the ambulatory surgical center provision. The district court found that the physical plant requirements of the ambulatory surgical center provision would force the El Paso clinic to close. As a result, women in El Paso will be significantly farther from the nearest in-state ambulatory surgical center than women in the Rio Grande Valley. The distance from El Paso to San Antonio, for example, is greater than 500 miles. The Eighth Circuit has held that no travel distance within the state is too far. *See Fargo Women's Health Org. v. Schafer*, 18 F.3d 526, 533 (8th Cir. 1994). We have not so held. Our circuit has not identified whether there is a tipping point within the vast State of Texas, but at this early stage, we are hesitant to extend *Casey* to such a large distance. *But see Abbott II*, 748 F.3d at 598 ("*Casey* counsels against striking down a statute solely because women may have to travel long distances to obtain abortions.").

It is true that approximately half of the women from El Paso seeking abortions travel to Santa Teresa, New Mexico, which is in the same metropolitan area as El Paso and just across the state line. Despite the obvious practical implications of the New Mexico clinic's proximity to El Paso, our circuit's precedent suggests that our focus must remain on clinics within Texas when determining whether travel times create an undue burden. *See Jackson Women's Health Org.*, 760 F.3d at 457–58 (enjoining a Mississippi

---

[23] In light of *Abbott II*, the concurring and dissenting opinion does not explain how the incremental increase of approximately 100 miles between Corpus Christi and San Antonio constitutes an undue burden.

law on the grounds that it would shut down the only abortion clinic in the state). Although the situation in Texas is markedly different from that in Mississippi, the opinion in *Jackson* contains broad language that appears to go beyond the facts presented in that case. *See id.* at 457 ("Consistent with *Gaines*, we hold that the proper formulation of the undue burden analysis focuses solely on the effects within the regulating state—here, Mississippi."). The panel majority saw itself as "require[d] . . . to conduct the undue burden inquiry by looking only at the ability of Mississippi women to exercise their right within Mississippi's borders." *Id.* Given the panel's reliance on *Gaines*, the panel may have meant to apply its limitation only to states where all the abortion clinics would close. However, we are reluctant to construe the panel's broad language so narrowly in this emergency stay proceeding. Because of the long distance between El Paso and the nearest in-state abortion clinic, as well as the doubt that *Jackson* casts on whether we may look to out-of-state clinics, the State has not shown a strong likelihood of success on the merits of the challenge to the physical plant requirements of the ambulatory surgical center provision as applied to El Paso. Thus, the district court's injunction of the physical plant requirements of the ambulatory surgical provision will remain in force for El Paso.

We do, however, stay the injunction as to the operational requirements of the ambulatory surgical center provision because the district court made no findings about whether the El Paso clinic would be able to comply with those requirements. The district court's conclusion that the ambulatory surgical center provision imposed an undue burden rested solely on the district court's findings regarding the physical plant requirements. In view of H.B. 2's severability provision, as well as the similar provision in the regulations, 25 Tex. Admin. Code § 139.9, the district court erred by failing to

consider whether the physical plant requirements could be severed from the operational requirements, allowing the operational requirements to take effect. *See Abbott I*, 734 F.3d at 415.[24]  As a result, it does not appear that the district court's injunction of the operational requirements was supported by any evidence.  We therefore stay the district court's injunction of the operational requirements.

## D.

The district court also enjoined the ambulatory surgical center provision as applied to medication abortions.  To the extent the district court concluded that the ambulatory surgical center provision had an improper purpose as applied to medication abortion, we have already rejected that argument for the reasons stated above.  To the extent that the district court determined that the provision's effect as applied to medication abortion was unconstitutional, the record evidence does not support that conclusion.  In conducting its own balancing analysis, the district court stated that "any medical justification for the requirement is at its absolute weakest in comparison with the heavy burden it imposes." *Whole Woman's Health*, slip op. at 18.  However, as discussed, our circuit does not incorporate a balancing analysis into the undue burden inquiry. *See Abbott II*, 748 F.3d at 594 (citing *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 440 (1985)).  The district court provided no support for its conclusion other than its improper balancing.  The district court did not cite to record evidence or make any findings to support its conclusion that the ambulatory surgical center

---

[24] Indeed, the district did not appear to address the constitutionality of the implementing regulations.  To the extent that it invalidated the regulations *sub silentio*, its failure to consider the severability provision in the regulations was error.

provision imposes an undue burden as applied to medication abortions.[25] Indeed, at oral argument, Plaintiffs could not identify any findings in the district court's opinion supporting the conclusion that the ambulatory surgical center provision imposed an undue burden as applied to medication abortion.  Thus, the State has shown a substantial likelihood of success on the merits of the district court's injunction of the ambulatory surgical center provision as applied to medication abortions.

## VI.

As in *Abbott I*, the State has made a strong showing of likelihood of success on the merits of its appeal as to all of the district court's injunctions except for the injunction of the physical plant requirements of the ambulatory surgical center provision as applied to the clinic in El Paso.  Regarding the other three factors we must weigh in determining whether to grant a motion to stay pending appeal, the State has also met its burden.  "When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws.  *Abbott I*, 734 F.3d at 419 (citing *Maryland v. King*, 133 S. Ct. 1, 3 (2012); *New Motor Vehicle Bd. v. Orrin W. Fox Co.,* 434 U.S. 1345, 1351 (1977)).  The public interest is directly aligned with the State's interest.  *Nken,* 556 U.S. at 435.  To the extent the State's interest is at stake, so is the public's.  *Abbott I,* 734 F.3d at 419.  We recognize that Plaintiffs have also made a strong showing that their interests will be injured by a grant of the stay.  However, given that the first two factors are the most critical, *Nken*, 556 U.S. at 434, and the State has made a strong showing regarding each, a stay is appropriate.  We have addressed only the issues necessary to rule on the motion for a stay pending appeal, and

---

[25] In *Abbott II*, we noted that medication abortions have higher complication rates than surgical abortions.  *Abbott II*, 748 F.3d at 602.

our determinations are for that purpose and do not bind the merits panel. *See, e.g., Abbott I*, 734 F.3d at 419.

IT IS ORDERED that Appellants' opposed motion for stay pending appeal is GRANTED, in part, and DENIED, in part, and that the district court's injunction orders are STAYED until the final disposition of this appeal, in accordance with this opinion.

14-50928

STEPHEN A. HIGGINSON, Circuit Judge, concurring in part and dissenting in part:

I too would deny the State's motion for a *blanket* stay of the district court judgment entered on August 29, 2014, pending appeal. I agree with a stay of the district court's facial invalidation of the admitting-privileges requirement because the plaintiffs did not request that relief. *See Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 (5th Cir. 2014). Second, I agree with a stay to allow enforcement of the operational requirements of the ambulatory surgical center ("ASC") provision because the district court only evaluated the burdens imposed by the provision's physical plant requirements. Applying H.B. 2's severability provision, however, I would not stay the district court's facial invalidation of the physical plant requirements. Finally, I would narrow the stay so that it does not reach the admission-privileges requirement as applied to the McAllen and El Paso clinics, which the district court found would result in closure of all clinics west and south of San Antonio.[1]

As to the first stay factor, the district court found, after trial with witness credibility determinations, that an undue burden existed because Texas had over forty abortion clinics prior to the enactment of H.B. 2, and

---

[1] I do not believe that the State has shown a strong likelihood of success on the merits of its argument that this as-applied challenge is barred by res judicata. This court in *Abbott II* disavowed relying on any new factual developments that were not in the record before the district court during the bench trial in *Abbott*. *See Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott* (*Abbott II*), 748 F.3d 584, 599 n.14 (5th Cir. 2014). Significantly, *Abbott II* anticipated that physicians, like those in McAllen and El Paso, would gain admitting privileges. *See id.* at 598-99 & n.13; *see also Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786, 807 (7th Cir. 2013) (Manion, J., concurring) ("The notion that abortion doctors will be unable to obtain admitting privileges is a fiction."). Indeed, as *Abbott II* acknowledged, "[l]ater as-applied challenges can always deal with subsequent, concrete constitutional issues." *Id.* at 589; *see also Jackson Women's Health Org.*, 760 F.3d at 450-51 (evaluating the impact of H.B. 1390 after the plaintiff's doctors were conclusively denied admitting privileges). Now that the physicians' applications have been denied, the availability of abortion services for women living near the McAllen and El Paso clinics has concretely changed. *See* Restatement (Second) of Judgments § 24, cmt. (f) ("Where important human values . . . are at stake, even a slight change of circumstances may afford a sufficient basis for concluding a second action may be brought.").

14-50928

that after the ASC provision takes effect, only seven or eight clinics will remain, representing more than an 80% reduction in clinics statewide in nearly fourteen months, with a 100% reduction in clinics west and south of San Antonio. *See Okpalobi v. Foster*, 190 F.3d 337, 357 (5th Cir. 1999) ("A measure that has the effect of forcing all or a substantial portion of a state's abortion providers to stop offering such procedures creates a substantial obstacle to a woman's right to have a pre-viability abortion, thus constituting an undue burden under *Casey*."), *vacated on other grounds on reh'g en banc*, 244 F.3d 405 (5th Cir. 2001); *cf. also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (finding no undue burden when "no woman seeking an abortion would be required by the new law to travel to a different facility than was previously available"); *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 869 (1992) ("[I]t falls to us to give some real substance to the woman's liberty to determine whether to carry her pregnancy to full term."). The district court further found that there was no credible evidence of medical or health benefit associated with the ASC requirement in the abortion context. At this emergency stay point, the State does not challenge as clear error either set of factual findings.[2] Weighing lack of medical benefit against the significant reduction in clinic access, the district court found the burden to be "undue."

---

[2] The majority opinion lists the following additional findings made by the district court, which are entitled to deference, *see Anderson v. Bessemer*, 470 U.S. 564, 573-74 (1985); *N.A.A.C.P. v. Fordice*, 252 F.3d 361, 365 (5th Cir. 2001): (1) the construction costs of bringing existing clinics into compliance with ASC standards "will undisputedly approach 1 million dollars and will most likely exceed 1.5 million dollars"; (2) for existing clinics that cannot comply due to physical space limitations, "[t]he cost of acquiring land and constructing a new compliant clinic will likely exceed three million dollars"; (3) if both challenged H.B. 2 provisions are enforced, women's travel distances to clinics will significantly increase: 1.3 million women of reproductive age in Texas will live more than 100 miles from a clinic, 900,000 women will live more than 150 miles from a clinic, 750,000 women will live more than 200 miles from a clinic, and some women will live as far as 500 miles from a clinic; (4) the burdens of increased travel combine with "practical concerns include[ing] lack of availability of child care, unreliability of transportation, unavailability of appointments at abortion facilities, unavailability of time off from work, immigration status and . . . poverty level, [and] the time and expense involved in traveling long distances"; and (5) the remaining seven or eight clinics will unlikely have the capacity to perform 60,000-72,000 abortions per year in Texas.

The majority opinion disagrees, concluding especially that the district court "erred when it balanced the efficacy of the ambulatory surgical center provision against the burdens the provision imposed."  For my part, I do not read *Abbott II* to preclude consideration of the relationship between the severity of the obstacle imposed and the weight of the State's interest in determining if the burden is "undue."  Although I agree with the majority opinion that *Abbott II* rejected the district court's assessment of empirical data as part of its *rational-basis* analysis, *see* 748 F.3d at 594, *Abbott II* did not expressly disclaim such an inquiry for purposes of the *undue-burden* prong, *see id.* at 590 (referring to "*Casey's* undue burden *balancing* test" (emphasis added)).  In *Abbott II*—in contrast to the district court's factual findings in this case—our court concluded that there had been "no showing whatsoever that *any* woman [would] lack reasonable access to a clinic within Texas."  *Id.* at 598.  In light of the minimal or non-existent burden found on that record, the court in *Abbott II* did not need to conduct an in-depth analysis of the State's interest as part of its undue-burden review.  Other courts' criticism of *Abbott II* on this ground is therefore inexact.  *See Planned Parenthood Ariz., Inc. v. Humble*, 753 F.3d 905, 914 (9th Cir. 2014); *Planned Parenthood Se., Inc. v. Strange*, No. 2:13cv405-MHT, 2014 WL 3809403, at *7-8 (M.D. Ala. Aug. 4, 2014).

Consistent with this analysis, the district court considered the weight of the State's interest in its undue-burden review.  *See Barnes v. Mississippi*, 992 F.2d 1335, 1338 (5th Cir. 1993) ("As long as *Casey* remains authoritative, the constitutionality of an abortion regulation thus turns on an examination of the importance of the state's interest in the regulation and the severity of the burden that regulation imposed on the woman's right to seek an abortion."); *see also Casey*, 505 U.S. at 878 ("*Unnecessary* health regulations

that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right." (emphasis added)).  In doing so, the district court adhered to reasoning that reconciles, rather than divides, circuit authority applying *Casey's* undue-burden test. *See, e.g.*, *Humble*, 753 F.3d at 912 ("[W]e compare the extent of the burden a law imposes on a woman's right to abortion with the strength of the state's justification of the law.  The more substantial the burden, the stronger the state's justification for the law must be to satisfy the undue burden test."); *Van Hollen*, 738 F.3d at 798 ("The feebler the medical grounds, the likelier the burden, even if slight, to be 'undue' in the sense of disproportionate or gratuitous."); *see also* ROBERT A. LEFLAR, APPELLATE JUDICIAL OPINIONS 235 (1974) ("[C]ompeting values . . . must somehow be brought together so that as much as possible of the good in each can be protected and preserved.").

I also do not see a strong likelihood of legal error related to the district court's demographic calculations pertaining to impact on women, relevant both to its facial invalidation of the ASC provision, as well as to our stay factors.  First, the district court recognized that there are 5.4 million women of reproductive age in Texas.  Next, the district court found that if the ASC provision goes into effect, 900,000 women will live more than 150 miles from an abortion clinic; 750,000 women will live more than 200 miles from a clinic; and some women will live as far as 500 miles or more from a clinic.  Furthermore, the district court explicitly considered the financial and other practical obstacles that interact with and compound the burdens imposed by the law, both in it its discernment of a substantial obstacle and also in its assessment of impact on women.[3]  Finally, the district court also found that

---

[3] Indeed, the State forthrightly acknowledged during oral argument that the real-world context in which women's decisions are made and operate does factor into the undue-burden

36

the remaining seven or eight abortion ASCs lack sufficient capacity to accommodate all women seeking abortions in the state. Indeed, these remaining clinics would have to increase by at least fourfold the number of abortions they perform annually. Altogether, although the district court did not use the phrase "large fraction," its findings—which related not only to travel distances but also to other practical obstacles—demonstrate that enforcement of the ASC provision will likely affect a significant number *and* a large fraction of women across the state of Texas. *See Casey*, 505 U.S. at 893-95 (facially invalidating Pennsylvania's spousal-notification requirement because it would "likely prevent a *significant number* of women from obtaining an abortion" (emphasis added)).

As to the remaining stay factors, which reasonable minds may balance differently, and in this case do, it is nonetheless undisputed that the State for decades has not held plaintiffs' clinics to ASC standards—indeed, never until now. Based on the record established at trial, assessed firsthand by the district court, I do not perceive that Texas has demonstrated urgency, medical or otherwise, to immediate enforcement. After hearing conflicting expert testimony, the district court found that "abortion in Texas [is] extremely safe with particularly low rates of serious complications," and further found that "risks are not appreciably lowered for patients who undergo abortion at ambulatory surgical centers." The denial of a stay would preserve this status quo pending our court's ultimate decision on the correctness of the district court's ruling. *See Commodity Futures Trading Comm'n v. British Am. Commodity Options Corp.*, 434 U.S. 1316, 1320 (1977).

---

analysis, even if the State will contend that the record does not support the interplay of circumstance and law that the district court held to be determinative.

On the other hand, the district court found that if the ASC requirement goes into effect plaintiffs likely will suffer substantial injury, notably that enforcement would cause clinics to close in Corpus Christi, San Antonio, Austin, McAllen, El Paso, Houston, and Dallas. The longer these clinics remain closed, the less likely they are to reopen if this court affirms that the law is unconstitutional. The district court further found that only seven or eight clinics will remain open, and that these clinics alone lack sufficient capacity. Unless shown to be clear error, this circumstance is comparable to the one the Seventh Circuit observed would subject patients "to weeks of delay because of the sudden shortage of eligible [clinics]—and delay in obtaining an abortion can result in the progression of a pregnancy to a stage at which an abortion would be less safe, and eventually illegal." *See Van Hollen*, 738 F.3d at 796.

Agreeing not to impose a blanket stay on direct appeal, but not having convinced colleagues whom I respect as to the scope of the stay that is appropriate, I would grant the State's independent request to expedite its appeal of an underlying issue that has complexity which divides courts, as well as profundity which divides convictions deeper than the rules of law courts must apply.